# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Christine M. Arguello

Criminal Case No. 18-cr-00228-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ARLENE PEREDA,
    a/k/a "Marisol"

      Defendant.

## MEMORANDUM OPINION ON SENTENCING

Defendant Arlene Pereda was charged by Indictment dated May 15, 2018, with 4 counts relating to Possession with Intent to Distribute Methamphetamine, Felon in Possession, and Possessing a Firearm in Furtherance of a Drug Trafficking Crime. On September 18, 2018, pursuant to a plea agreement, Ms. Pereda entered a plea of guilty to, and was convicted of, Count 2 charging a violation of 18 U.S.C. 841(a)(1) and (b)(1)(A)(viii) – Possession With Intent to Distribute 500 Grams or More of a Mixture Containing Methamphetamine. On January 16, 2019, the Court sentenced Ms. Pereda to 188 months imprisonment, which constitutes a downward variance from the recommended imprisonment range under the United States Sentencing Guidelines. There are several reasons for the variance, including the Court's policy disagreement with the Guidelines' treatment of offenses involving actual/pure methamphetamine. This Memorandum Opinion further explains the Court's policy disagreement.

# I. PROCEDURAL HISTORY

Ms. Pereda was originally set to be sentenced on December 18, 2018. As initially calculated based on "Ice" or methamphetamine actual, the total offense level in this case was 37 and Ms. Pereda's criminal history category was IV which results in a Guideline range of **292-365** months imprisonment. (Doc. # 55-1 at 2.) However, the Court continued Ms. Pereda's sentencing so the parties could provide additional briefing as to whether application of the United States Sentencing Guidelines ("USSGs" or "Guidelines") to determine the offense level for "Ice" methamphetamine results in a sentencing range that is greater than necessary to achieve the objectives of sentencing, and grossly over-punishes methamphetamine dealers, as compared to dealers of other types of illegal drugs, thus justifying a downward variance from the guidelines. The parties both submitted additional briefing on January 9, 2019. (Doc. ## 64, 65.) The Court also ordered the Probation Office to provide an addendum to the Presentence Investigation Report calculating the advisory guideline range under the Guidelines relating to a mixture containing a detectable amount of methamphetamine, rather than actual/pure methamphetamine. The Probation Office determined that, if calculated as a mixture, Ms. Pereda's advisory Guideline range would be **188 to 235** months, based on a total offense level of 33 and a Criminal History Category of IV.[1] (Doc. # 61 at 2.)

It is clear that Ms. Pereda would spend significantly less time in prison if her advisory Guideline sentence were based on a mixture containing a detectable amount

---

[1] The Probation Office's calculations include a two-level enhancement for maintaining a drug premises pursuant to USSG § 2D1.1(b)(12). Ms. Pereda objected to the two-level enhancement. (Doc. # 52.) The Court overruled this objection at the December 18, 2018 hearing, and found the two level enhancement of § 2D1.1(b)(12) was appropriately applied. The calculations also took into account Ms. Pereda's possession of a firearm and acceptance of responsibility.

of methamphetamine rather than pure methamphetamine. For the reasons set forth below, the Court found that the advisory Guideline range for "Ice" or methamphetamine actual results in a sentencing range that is greater than necessary to achieve the objectives of sentencing. Thus, the Court imposed a sentence that constituted a downward variance from the Guidelines to satisfy the sentencing objectives set forth in 18 U.S.C. § 3553(a).

## II. BACKGROUND

The current Guidelines establish base offense levels for methamphetamine offenses that depend on the drug's purity. For example, a defendant whose offense involves 150 grams of a methamphetamine mixture is treated the same as another defendant whose offense involves 15 grams—ten times less—of actual/pure methamphetamine. *United States v. Requena*, No. 4:18-cr-00175-BLW, 2019 WL 177932, at *2 (D. Idaho January 11, 2019); *United States v. Ferguson*, No. 17-204 (JRT/BRT), 2018 WL 3682509, at *1 (D. Minn. Aug. 2, 2018) (citing U.S.S.G. § 2D1.1(c)(2)).

However, that was not always the case. Unlike the current Guidelines, the 1987 Guidelines' Drug Quantity Table did not distinguish between actual/pure methamphetamine and methamphetamine mixtures but indicated that "purity of the controlled substance . . . may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution." U.S.S.G. § 2D1.1 (1987) cmt. 9.

In 1988, Congress established mandatory-minimum sentences for methamphetamine offenses. *See* Anti-Drug Abuse Act of 1988 (codified at 21 U.S.C. §

841(b)(1)). The mandatory minimums had a 10-to-1 ratio based on purity and an "offense involving 100g of a methamphetamine mixture or 10g of actual/pure methamphetamine had a 5-year mandatory minimum; and an offense involving 1kg of a methamphetamine mixture or 100g of actual/pure methamphetamine had a 10-year mandatory minimum." *Ferguson*, 2018 WL 3682509, at *1.

Subsequently, in 1989, the United States Sentencing Commission revised the Drug Quantity Table in § 2D1.1 by incorporating the statutory penalties and by distinguishing actual/pure methamphetamine from methamphetamine mixtures at the same 10-to-1 ratio. *Id.*

Similarly, in 1998, Congress amended the statutory penalties for methamphetamine offenses by halving the amounts that triggered the respective mandatory-minimum sentences. *Id.* (citing Methamphetamine Trafficking Penalty Enhancement Act of 1998, Pub. L. No. 105-277). As in 1989, the Commission followed Congress's lead again and accordingly increased the base offense levels for methamphetamine offenses. *Id.* Therefore, the Commission twice amended the Guidelines for methamphetamine so that "the base offense levels (for a defendant with a criminal history category of I) would exactly align with the mandatory-minimum sentences—and the Commission did so each time right after Congress created or changed the minimum sentences." *Id.*

### III.    ANALYSIS

District courts may impose sentences that vary from the Guidelines based on a policy disagreement with the Guidelines. *Spears v. United States*, 555 U.S. 261, 267 (2009) (per curiam); *Kimbrough v. United States*, 552 U.S. 85, 101-02 (2007); *Rita v.*

*United States*, 551 U.S. 338, 351 (2007). Although each criminal sentence is an individualized determination, *see* 18 U.S.C. § 3553(a), a district court's policy disagreement with the Guidelines may justify categorical variances, not just variances based on individualized determinations. *Spears*, 555 U.S. at 267. "Several [courts of appeals] have expressly held that *Spears* and *Kimbrough* mean that district courts have broad authority to premise a variance or disagreement with the policy of any guideline." *United States v. Trejo*, 624 F. App'x 709, 713 (11th Cir. 2015) (collecting cases); *see United States v. Zauner*, 688 F.3d 426, 431 (8th Cir. 2012) (Bright, J., concurring); *Ferguson*, 2018 WL 3682509, at *2.

"[T]he Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough*, 552 U.S. at 108-09 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). Normally, the Commission's recommendation of a sentencing range reflects a rough approximation of sentences that might achieve § 3553(a)'s objectives. *Id.* at 109 (quoting *Rita*, 551 U.S. at 350). "In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the "heartland" to which the Commission intends individual Guidelines to apply.'" *Id.* (quoting *Rita,* 551 U.S. at 351.).

However, the Sentencing Commission deviated from the empirical approach when setting the Guideline ranges for drug offenses. Rather, the Commission chose instead to key the Guidelines to the statutory mandatory minimum sentences that

Congress established for those crimes. *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007); *see also United States v. Diaz*, No. 11-821, 2013 WL 322243, at *3–6 (E.D.N.Y. Jan. 28, 2013). In *Kimbrough*, the Supreme Court held that the "Guideline[ ] ranges for crack cocaine offenses did 'not exemplify the Commission's exercise of its characteristic institutional role,' and instead the Commission 'looked to the mandatory minimum sentences . . ., and did not take account of 'empirical data and national experience.'" *Ferguson*, 2018 WL 3682509, at *2 (citing 552 U.S. at 109 (quoting *Pruitt*, 502 F.3d at 1171)).

With respect to methamphetamine, no United States Circuit Court of Appeals has provided guidance to district courts with respect to rejecting the methamphetamine Guidelines, "presumably because of the district courts' wide discretion to decide the weight of the Guidelines." *United States v. Nawanna*, 321 F. Supp. 3d 943, 948 (N.D. Iowa 2018). However, a growing number of district courts have found that the Guideline ranges for offenses involving actual/pure methamphetamine, like their crack-cocaine counterparts, are not based on empirical data and national experience, and thus do not exemplify the Commission's exercise of its characteristic institutional role. *See, e.g.*,:

- *United States v. Requena*, No. 4:18-cr-00175-BLW, 2019 WL 177932, at *2 (D. Idaho January 11, 2019);
- *United States v. Ferguson*, No. 17-204, 2018 WL 3682509, at *3 (D. Minn. Aug. 2, 2018) (Tunheim, C.J.);
- *United States v. Harry*, 313 F. Supp. 3d 969, 973–75 (N.D. Iowa 2018) (Strand, C.J.);
- *United States v. Nawanna*, 321 F. Supp. 3d 943, 945 (N.D. Iowa 2018) (Bennett, J.);
- *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1252–54 (D.N.M. 2017) (Brack, J.);
- *United States v. Jennings*, No. 16-48, 2017 WL 2609038, at *2–4 (D. Idaho June 15, 2017) (Winmill, C.J.);
- *United States v. Ortega*, No. 09-400, 2010 WL 1994870, at *4–7 (D. Neb. May 17, 2010) (Bataillon, C.J.).

Rather, these courts have persuasively found that "the Commission simply keyed the Guidelines range to the statutory mandatory minimum sentences Congress established for drug crimes, despite the fact that the resulting Guidelines sentences would be 'much more severe than the average sentences previously meted out to drug trafficking offenders.'" *See Ferguson*, 2018 WL 3682509, at *3 (quoting *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1253 (D.N.M. 2017) (quoting *Diaz*, 2013 WL 322243, at *5)); *see also Harry*, 313 F. Supp. 3d at 974–75; *Nawanna*, 321 F. Supp. 3d at 950; *Jennings*, 2017 WL 2609038, at *2–4; *Ortega*, 2010 WL 1994870, at *4–7.

This Court agrees with those courts which—exercising their discretion under *Kimbrough* and *Spears*—have granted downward variances when sentencing defendants convicted of offenses involving actual/pure methamphetamine, in part, because of those courts' policy disagreements with the Guideline ranges for actual/pure methamphetamine offenses. *See, e.g.*, *Ferguson*, 2018 WL 3682509, at *3.

First, the 10-to-1 methamphetamine purity ratio established by the Guidelines is not based on empirical evidence. This creates Guideline ranges for actual (and ice) methamphetamine that are excessive and not similar to other Guidelines, which are intended to be representative of a "heartland" or "a set of typical cases embodying the conduct that each guideline describes." *Harry*, 313 F. Supp. 3d at 972; *United States v. Diaz*, No. 11-821-2, 2013 WL 322243, at *8 (E.D.N.Y. January 28, 2013) (quoting U.S.S.G. Manual § 1A4.13 (1987)) (explaining Sentencing Commission's stated theory underlying the Guidelines); *see also Ferguson*, 2018 WL 3682509, at *3; *Nawanna*, 321 F. Supp. 3d at 950; *Ibarra-Sandoval*, 265 F. Supp. 3d at 1252-53; *Jennings*, 2017 WL 2609038, at *3; *Ortega*, 2010 WL 1994870, at *6-7.

For instance, in *United States v. Santillanes*, No. 07–619 (D.N.M. Sept. 19, 2009), the court found that there is

> . . . no empirical data or study to suggest that actual purity [of methamphetamine] should be punished more severely by an arbitrary [sentence] increase . . . in this case or at the higher level. It seems to be black box science, as best I can determine. I probably would not allow it under *Daubert*, based on what I know at present. It seems to be contrary to any empirical evidence, and really undermines Section 3553(a), as it does create an unwarranted disparity. It seems to me that this is not even a rough approximation to comply with 3553, and is not really based on any consultation or criminal justice goals or data.

Transcript of Sentencing Hearing, *United States v. Santillanes*, No. 07–619 (D.N.M. Sept. 19, 2009), available on PACER at https://ecf.mmd.uscourts.gov/doc1/121119-17143).

Additionally, to the extent it could be argued that the 10-to-1 ratio is an expression of Congress's views about how offenses involving actual/pure methamphetamine should be punished, the Supreme Court clearly rejected such reasoning in *Kimbrough*. *Ferguson*, 2018 WL 3682509, at *3. There, the Supreme Court held that "[t]he statute, by its terms, mandates only maximum and minimum sentences . . . . The statute says nothing about the appropriate sentences within these brackets." *Id.* (quoting *Kimbrough*, 552 U.S. at 102-03).

Second, methamphetamine purity is no longer a proxy for, and thus not probative of, a defendant's role or position in the chain of distribution. The average purity of all methamphetamine in the United States is greater than 90 percent—and has been since 2011—according to the DEA. U.S. Dep't of Justice, Drug Enforcement Admin., *2017 National Drug Threat Assessment* 67-70 (2017), https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf; *see also*

*Ferguson*, 2018 WL 3682509, at *4; *Harry*, 313 F. Supp. 3d at 972; *Nawanna*, 321 F. Supp. 3d at 951–52; *Ibarra-Sandoval*, 265 F. Supp. 3d at 1253; *Jennings*, 2017 WL 2609038, at *3; *Ortega*, 2010 WL 1994870, at *7.

Consequently, punishing low-level offenders as if they had played a prominent role in drug trafficking "can lead to perverse sentencing outcomes." *Nawanna*, 321 F. Supp. 3d at 953; *see also Ferguson*, 2018 WL 3682509, at *4; *Harry*, 313 F. Supp. 3d at 972–75; *Ibarra-Sandoval*, 265 F. Supp. 3d at 1253; *Jennings*, 2017 WL 2609038, at *3; *Ortega*, 2010 WL 1994870, at *7. This creates a substantial risk of unwarranted sentencing disparities, which courts must avoid. 18 U.S.C. § 3553(a)(6); *see also Ferguson*, 2018 WL 3682509, at *4; *Nawanna*, 321 F. Supp. 3d at 948; *Ibarra-Sandoval*, 265 F. Supp. 3d at 1253; *Jennings*, 2017 WL 2609038, at *7; *Ortega*, 2010 WL 1994870, at *3.

Third, the prevalence of high-purity methamphetamine effectively guarantees that a defendant's base offense level under the Guidelines will substantially increase if the methamphetamine is tested for purity, which is a decision that can be entirely arbitrary. *Ferguson*, 2018 WL 3682509, at *4 (citing *Nawanna*, 321 F. Supp. 3d at 948; *Ibarra-Sandoval*, 265 F. Supp. 3d at 1256; *Jennings*, 2017 WL 2609038, at *4; *Ortega*, 2010 WL 1994870, at *4-7). Factors contributing to arbitrary purity testing include: authorities seizing only some of the drugs, limiting the sample available for testing; labs being too busy to complete testing before sentencing; defendants pleading guilty to avoid purity testing; and prosecution originating with a state agency where testing could not be completed in a timely manner. *Id.* at *3. Such a dynamic potentially leads to a "perverse game of beat the clock, whereby an accused may try to plead guilty and get sentenced

before lab results come back, so that his offense is treated as involving a methamphetamine mixture rather than actual/pure methamphetamine." *Id.*

It is indisputable that a lab technician's work-speed should not determine the number of years a person spends in prison. *Id.* at *4. This is not merely a theoretical concern. Within the last six months alone, courts have observed Guideline calculations increasing substantially after a sample of methamphetamine's purity has been determined. *Id.*

Finally, the Guidelines inexplicably treat offenses involving methamphetamine mixtures more harshly than offenses involving other substances. *See, e.g., id.* at *3. The Chief Judge of the Northern District of Iowa, Leonard T. Strand, astutely noted the following:

> As a hypothetical, consider a defendant with a Criminal History Category of IV who is found to be responsible for conspiring to distribute either (a) 500 grams of heroin or (b) 500 grams of 95% pure methamphetamine. The heroin conspirator would have a base offense level of 26 and, assuming no increases or reductions in the offense level, an advisory Guidelines range of 92–115 months.
>
> The methamphetamine conspirator would be subject to the ice methamphetamine Guidelines (80% purity or higher) and, therefore, would have a base offense level of 34. Again[,] assuming no increases or reductions in the offense level, the resulting advisory Guidelines range would be 210–262 months—more than twice the range of the heroin conspirator. Why? Is ice methamphetamine more than twice as potent, dangerous, destructive or addictive than heroin? I am aware of no objective evidence—from the United States Sentencing Commission or otherwise—supporting such a proposition.

*Harry*, 313 F. Supp. 3d at 973 (footnote omitted). Moreover, although rejecting the actual/pure methamphetamine Guidelines will result in reduced, alternative Guideline ranges, "this will hardly constitute a windfall to defendants in methamphetamine cases"

because "even the less-harsh methamphetamine mixture Guideline ranges are . . . higher than the ranges for similar quantities of heroin and cocaine . . . ." *Id.* at 974.

In sum, the unfounded sentencing disparity results in defendants accused of crimes involving methamphetamine being incarcerated for substantially longer than defendants who have engaged in almost undistinguishable conduct, albeit with other drugs. Notably, the "average and median length of imprisonment for methamphetamine offenders during fiscal year 2017 were 91 months and 72 months, respectively, higher than for any other drug, and a 30% higher average and a 26.32% higher median than for heroin (70 months and 57 months, respectively)." *Nawanna*, 321 F. Supp. 3d at 953. This Court will not be complicit in such an injustice.

### IV. <u>CONCLUSION</u>

Based on the reasoning above, this Court sentenced Ms. Pereda to 188 months imprisonment, which if found to be a sufficient but not greater than necessary sentence that would not result in any unwarranted sentencing disparities. As in *Nawanna*, its sentence calculation was based on the Guideline range attributable to methamphetamine mixtures, as well as the 18 U.S.C. § 3553(a) factors. *See also Ferguson*, 2018 WL 3682509, at *4 (considering the Guideline range for methamphetamine mixtures instead of actual/pure methamphetamine); *Harry*, 313 F. Supp. 3d at 974 (same); *Nawanna*, 321 F. Supp. 3d at 956 (same); *Ibarra-Sandoval*, 265 F. Supp. 3d at 1256-57 (same); *see also Spears*, 555 U.S. at 265 (2009) ("A sentencing judge who is given the power to reject the disparity created by the crack-to-powder ratio must also possess the power to apply a different ratio which, in his

judgment, corrects the disparity. Put simply, the ability to reduce a mine-run defendant's sentence necessarily permits adoption of a replacement ratio.").

However, this Court declined to vary below the advisory Guideline range based on methamphetamine mixtures because Ms. Pereda was a large-scale distributor who possessed multiple dangerous weapons and had a significant criminal history. *But cf. United States v. Hayes*, 948 F. Supp. 2d 1009, 1031 (N.D. Iowa 2013) (reducing sentence advised by methamphetamine Guidelines by one-third for addict who sold a relatively small amount of methamphetamine; played a minor role in distribution; and whose offense did not involve firearms).

DATED: February 6, 2019

BY THE COURT:

*Christine M. Arguello*
CHRISTINE M. ARGUELLO
United States District Judge